OPINION OF THE COURT
Tom, J.P.
The law imposes a strict standard for a stop and frisk, requiring an officer to have a reasonable suspicion of an individual’s involvement in criminal activity (CPL 140.50 [1]; People v De Bour, 40 NY2d 210, 223 [1976]) and then “knowledge of some fact or circumstance that supports a reasonable suspicion that the suspect is armed or poses a threat to safety” (People v Batista, 88 NY2d 650, 654 [1996]; CPL 140.50 [3]). The motion court erred in holding that a police officer exercising the common-law right to inquire without a reasonable suspicion of criminal activity may subject the individual he is questioning to a frisk under the guise that the officer claimed to perceive some threat to his personal safety. Such ruling broadly expands the power of the police to search an individual during street encounters and can too easily lead to the diminishment of one of the most cherished rights, the right of individuals to be secure in their persons against illegal searches and seizures (NY Const, *71 art I, § 12; US Const 4th Amend). The gradual erosion of this basic liberty can only tatter the constitutional fabric upon which this nation was built. The ramifications go beyond this single case. Widespread, aggressive police tactics in street encounters have recently raised concerns in other judicial forums. In People v Holland (18 NY3d 840 [2011, Lippman, Ch. J., dissenting]), the Chief Judge took issue with his own Court’s dismissal of the appeal as “not only unsound jurisdictionally, but erosive of this Court’s role in articulating the law governing police-civilian encounters” (id. at 845). He stated:
“When courts with the factual jurisdiction to make attenuation findings employ facile analytic shortcuts operating to shield from judicial scrutiny illegal and possibly highly provocative police conduct, an issue of law is presented that is, I believe, this Court’s proper function to resolve . . . This is not an exaggerated or purely academic concern in a jurisdiction where, as is now a matter of public record, hundreds of thousands of pedestrian stops are performed annually by the police, only a very small percentage of which actually result in the discovery of evidence of crime” {id.).
In a footnote, Chief Judge Lippman made reference to Floyd v City of New York (813 F Supp 2d 417 [SD NY 2011]), in which the United States District Court noted, “[T]he policing policies that the City has implemented over the past decade and a half have led to a dramatic increase in the number of pedestrian stops, to the point of now reaching almost 600,000 a year” (id. at 422 [internal quotation marks omitted]). The District Court has now granted class action status to the plaintiffs in that case to challenge the constitutionality of the New York Police Department’s stop-and-frisk program (Floyd v City of New York, 2012 WL 1868637, 2012 US Dist LEXIS 68676 [SD NY, May 16, 2012, 08 Civ 1034 (SAS)]).
While the dissent’s opening paragraph frames the issue in somewhat dramatic terms, the actual testimony in this case presents a picture that is more pedestrian in all senses of the word. Appellant, a 14-year-old boy standing alone on the street, was stopped in broad daylight, by a police officer who believed appellant to be a truant, not a gang member, holding an object that the officer could not identify. The subsequent search was conducted without any evidence that the appellant was engaged in criminality or that he represented any threat to the safety of the officer. The motion court’s ruling would, in effect, give the *72 police the authority to stop and frisk a pedestrian who is not a suspect of a crime.
The facts herein, even crediting the officer, prohibit the search undertaken in this case. At a combined Wade/Dunaway hearing, the testimony of Police Officer Orlando Colon, the arresting officer, established that on February 18, 2010, at about 11:30 a.m. he was on uniform patrol with three other officers in an unmarked van in the vicinity of 40 West Tremont Avenue, Bronx County. As a result of tensions between two rival youth gangs, multiple shootings had occurred in the area, the two most recent within four blocks of the officer’s location. The context of gang violence explained the officer’s presence at that location. From the van, at a distance of about 10 feet, Colon observed the 14-year-old appellant standing alone on the sidewalk “examining an object with his right hand and in his left hand he had a cell phone.” Appellant was not a suspect, nor was he associated with any gang activity. Although it was broad daylight, the officer could not describe or identify the object appellant was looking at, except to state that it was black and held in appellant’s right palm near his waist. Then, Colon testified, appellant “looks up, he sees the van. I’m assuming he saw it was a police van.” Colon continued, “He stared at the van. He stopped, put the object in his right pocket and continued to walk and . . . handle the cell phone.” At this point, this unexceptional activity was the extent of the officer’s observations. Colon then left the vehicle, approached appellant and engaged him in conversation. Colon learned that appellant had come from Queens to visit his stepbrother who, the officer surmised, lived in a building where one of the rival youth gangs was concentrated. Colon then asked appellant what he had in his right hand, and appellant responded that it was his wallet. Colon testified that “[d]uring the course of the conversation he was stuttering a little bit. A little bit nervous.” I will depart from a strict reading of the evidence to this limited extent: a 14-year-old boy confronted by a police officer might be “a little bit nervous” without that fact raising a red flag. Colon continued that “[m]y suspicion didn’t heighten until I asked him what he had in his right hand and he told me it was his wallet that he had in the back of his pants p[o]cket. The answer was a little deceiving to me.” Colon testified that, having observed appellant put the object into his right coat pocket, not his back pocket, “I told him I’m not interested what he had in his back pocket. I’m interested what he put in his coat pocket.”
*73 When appellant “attempted to go into the back pocket” to retrieve his wallet, Colon told him, “[D]o me a favor. Don’t put your hands in your pocket,” with which appellant complied. Colon continued, “At this point I tapped his right jacket pocket. I felt it was a hard object,” although there was no indication that the object was any kind of weapon. Colon added, “At this point I repositioned myself to get an advantage. I go behind him. As I go behind him I put my right hand behind him. I tapped the pocket one more time and then I put my hand in the pocket.” Colon’s “hand went right into the pistol grip of the firearm.”
Family Court denied appellant’s motion to suppress the firearm, stating that “Officer Colon reasonably believed [appellant] to be armed and had a legitimate concern for his own safety. As such, he was justified in patting down the jacket pocket into which he saw [appellant] place a black object.” The court concluded, “[O]nce he felt the grip of a gun, Officer Colon then had a reasonable suspicion that [appellant] was involved in a crime, which authorized the officer to detain him.”
The Family Court’s conclusion that the discovery of the weapon affords reasonable suspicion of involvement in a crime reverses the necessary order of the analysis (De Bour, 40 NY2d at 215-216). As noted in People v Rivera (14 NY2d 441, 447 [1964], cert denied 379 US 978 [1965]), “[t]he question is not what was ultimately found, but whether there was a right to find anything” (see also Wong Sun v United States, 371 US 471, 484 [1963] [“that a search unlawful at its inception may be validated by what it turns up” is a proposition that has been consistently rejected]).
Family Court did not conduct the rigorous analysis required by People v De Bour (40 NY2d 210, 223 [1976], supra) to justify each escalation in interference with appellant’s freedom of movement. In De Bour, the Court of Appeals provides four levels of permissible official interference with an individual’s liberty. The minimal intrusion of approaching a person to request information requires only “some objective credible reason” to approach the individual that does not necessarily implicate criminal conduct (40 NY2d at 223). The second level of interference is the common-law right to inquire, triggered by a “founded suspicion” that criminal activity is afoot, which permits interference with an individual “to the extent necessary to gain explanatory information, but short of a forcible seizure” (id.). The third level is a forcible stop and detention, activated by a rea *74 sonable suspicion that a specific individual “has committed, is committing or is about to commit a felony or misdemeanor” (id.). Under the third level of interference, an officer making a forcible stop has authority to conduct a protective frisk of the individual if there is a reasonable threat of physical injury or reasonable suspicion that the person who can now be classified as a suspect is armed (CPL 140.50 [3]). The fourth level permits an officer to arrest an individual when there is probable cause to believe that the individual has committed a crime or offense in his or her presence (De Bour, 40 NY2d at 223; CPL 140.10).
The permissible stop and frisk under De Bour tracks CPL 140.50 (1) and (3) which provide in relevant part:
“[W]hen he [a police officer] reasonably suspects that such person is committing, has committed or is about to commit either (a) a felony or (b) a misdemeanor . . . [and] a police officer . . . reasonably suspects that he is in danger of physical injury, he may search such person for a deadly weapon.”
The issue before us is whether the arresting officer had a reasonable suspicion of appellant’s participation in a crime, combined with a reasonable fear for his personal safety, so as to justify the stop and frisk. Absent reasonable suspicion of involvement in a crime, there was no basis to stop and detain appellant and, thus, no basis for even considering conducting a frisk (De Bour, 40 NY2d at 223).
By giving seemingly evasive answers to Officer Colon’s questions, appellant arguably allowed for the possibility that he might have some form of contraband, warranting further questioning under the common-law right to inquire. But the officer never undertook any further inquiry, and nothing appellant said or did gave any indication that he had committed, was committing or was about to commit a crime — the necessary predicate for the forcible detention while appellant’s jacket pocket was searched (id.).
The frisk in this case elevated the encounter from mere inquiry to a forcible intrusion. Even if Officer Colon’s approach arguably was justified by a legitimate public interest in controlling gang violence and by his observation of appellant’s apparent reaction to seeing other uniformed police officers inside the unmarked van, the arresting officer’s own testimony clearly established that he did not have any reasonable suspicion that appellant was involved in a crime before he searched appellant. *75 During cross-examination of Colon the. following answers were elicited:
“Q So let’s go back, officer, again. At some point you asked him what did he put in his pocket?
“A Yes, ma’am.
“Q And he responded that he put a wallet in a pocket?
“A Yes, ma’am.
“Q It’s your testimony that this was friendly conversation. At this time you were talking to him and it was a friendly conversation, you were inquiring, correct?
“A That’s correct.
“Q And he had not become a suspect in any crime at that point, correct?
“A No, ma’am.
“Q And he had not been known to you as a gang member at that point?
“A No, ma’am.
“Q There was no indication that he was involved in any gang that you were investigating at that time, correct?
“A No.
“Q Yet you chose to pat him down for your safety?
“A Yes, ma’am.”
Here, the record affords no grounds for the forcible stop and detention, and in the absence of any basis for detaining appellant, the subsequent search lacks a lawful foundation. Moreover, notwithstanding the officer’s unelaborated subjective claim that his safety was threatened, that assertion is not grounded in any objective evidence that would convert the unsubstantiated claim into a reasonable fear. Colon could not identify the object appellant was holding and conceded that youths may hold any number of nondescript black objects, including video games, “Gameboys,” small school notebooks, or wallets. Further, Colon believed that the 14-year-old was a truant and not a gang member. As stated by Colon, his inquiry of appellant was a *76 friendly conversation. There was no evidence to show appellant posed a threat to Colon’s safety.
As noted above, Colon testified that at the time appellant responded that he put a wallet in his pocket, “he had not become a suspect in any crime.” Based on this testimony, Colon could not have suspected appellant of carrying a weapon. Thus, the dissent’s finding that Officer Colon had “reasonable suspicion that appellant committed a crime, namely that he was armed with a weapon,” is without support in the record and inconsistent with Colon’s testimony. This is pure conjecture on the part of the dissent without any evidentiary support.
Furthermore, as just noted, Officer Colon’s claim of “[r]easonable fear for [his] safety” also lacks support in the record. Officer Colon could not describe the object held by appellant or discern its nature, even after he had twice patted down the pocket of appellant’s jacket. In fact, after tapping the object twice, Officer Colon stated that “[i]t didn’t strike me right away as being a weapon, a knife or anything like that but it’s hard.” The dissent asserts that Colon did not say in his own words that the object “did not seem like a weapon.” However, that was the obvious implication of his testimony that after tapping on the object in appellant’s coat pocket on two separate occasions, the object “didn’t strike me right away as being a weapon.” It is beyond comprehension how the dissent concludes that Colon had a reasonable suspicion that appellant was armed with a weapon so as to justify a search, in light of Colon’s testimony that the object in appellant’s coat pocket did not seem like a weapon. It is clear from the officer’s testimony that until his hand reached into appellant’s coat pocket and encountered the pistol grip, he had no idea what was in appellant’s jacket pocket. This was a mere hunch at best, not a reasonable suspicion, that defendant might be armed, which is not the objective indicia of either criminality or a threat to the officer’s safety that is necessary to justify a search (Terry v Ohio, 392 US 1, 22 [1968]; People v Cantor, 36 NY2d 106, 113 [1975]).
The dissent’s ruling would permit a police officer to search an individual by the mere assertion that the person may be armed absent any articulated facts to support the officer’s claim of suspicion of criminality or of a reasonable threat of physical injury.
Colon’s bare assertion of a “[reasonable fear for [his] safety” is inconsistent with his own testimony that is noted above. Likewise, vague concerns about age and gender, presence in a *77 bad neighborhood and nervousness upon being confronted, all fall short of a reasonable suspicion that appellant personally presented “an actual and specific danger to the officer’s safety” (People v Carvey, 89 NY2d 707, 711 [1997] [internal quotation marks omitted]).
In explaining why he engaged in a more aggressive inquiry the officer testified that he had observed appellant’s wallet in his back pants pocket, when appellant had shoved the unidentified object into his right jacket pocket. While the officer’s testimony may contradict appellant’s explanation that he had been looking at his wallet when he inserted an object into his jacket, they also contradict the officer’s unelaborated assertion that he became concerned for his safety when he saw appellant reach for his back pocket, especially in view of the officer’s expressed disinterest in appellant’s back pocket presumably because he knew it contained a wallet. In any event, Officer Colon’s request, “[D]o me a favor. Don’t put your hands in your pocket,” is hardly an expression of fear for personal safety; rather, it is standard protocol.
It cannot be gainsaid that policing is hazardous by nature— here involving work in an area of gang activity, drug dealing and violent crime — but a pretext to excuse intrusive action may be found in nearly any encounter with a person who arouses enough suspicion to support the common-law right to inquire. While aggressive police tactics may well result in more arrests, neither respect for the law nor cooperation with law enforcement authorities is fostered by subjecting individuals to the exercise of arbitrary police power.
As noted in People v Cantor (36 NY2d at 112), the Fourth Amendment is not designed to protect those intent on criminality but “to prevent random, unjustified interference with private citizens.” The Court’s remarks in that case bear repeating:
“Street encounters between the patrolman and the average citizen bring into play the most subtle aspects of our constitutional guarantees. While the police should be accorded great latitude in dealing with those situations with which they are confronted it should not be at the expense of our most cherished and fundamental rights. To tolerate an abuse of the power to seize or arrest would be to abandon the law-abiding citizen to the police officer’s whim or caprice and this we must not do” (id.).
To condone Officer Colon’s search of appellant would, in essence, subject an individual, without any suspicion of his or her *78 involvement in a crime, to a frisk merely by reason of the person’s possibly innocuous behavior and, in this case, a teenager’s evasive response to the police officer, and the officer’s bare and unfounded claim of fear for his or her safety. If, as the dissent holds, the mere expression of apprehension by a police officer, without suspicion of criminal activity, is enough to justify a search, there will be few instances in which such an “intrusion on the security and privacy of the individual” could be successfully challenged even when the intrusion is “undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity” (De Bour, 40 NY2d at 217). This would constitute an illegal affront to the individual’s fundamental right to be secure from unreasonable searches and seizures (id. at 216; NY Const, art I, § 12; US Const 4th Amend).
The cases cited by the dissent in support of its proposition that a frisk is justified by a police officer’s mere suspicion that an individual is armed are distinguishable. They generally demonstrate that reasonable suspicion of criminality justifying a limited detention of a suspect is necessary to conduct a frisk, and they involve compelling indicia that the person searched was involved in the commission of some crime other than the possession of a weapon. In People v Davenport (92 AD3d 689 [2012]), police received a radio call of a shooting at a specific location. Arriving in under a minute, the officers encountered the nervous defendant, his hand on his waistband, making a slow retreat after making eye contact with an officer (id. at 689-690). That combination of factors — the information and the observation — is absent from this case. In People v Thanh Do (85 AD3d 436 [2011], lv denied 17 NY3d 905 [2011]), confidential information was received that a home invasion would take place at a specific location, where police encountered three men fitting the description of the robbers and searched the defendant after observing an L-shaped bulge in his waistband. Again, the information coupled with the observation justified the police action. In People v Johnson (22 AD3d 371 [2005], lv denied 6 NY3d 754 [2005]), the defendant’s “clothing and physical characteristics fit an armed robber’s description that was sufficiently specific, given the temporal and spatial factors” (id. at 372). In People v Greenidge (241 AD2d 395 [1997], affd 91 NY2d 967 [1998]), police received a radio transmission of an armed robbery and, only three blocks from the location of the crime, observed a man matching the general description they had received and the defendant, who was clutching a jacket under his arm as if conceal *79 ing something. In People v Brown (277 AD2d 107 [2000], lv denied 96 NY2d 756 [2001]), defendant and another man were seen hurrying away from an unlocked car, which was in disarray and which they had just parked in an area known to have a high incidence of stolen vehicles. It was not registered to either man, each of whom reached for his waistband upon becoming aware of the presence of plainclothes officers (id. at 108). In People v Davenport (9 AD3d 316 [2004], lv denied 3 NY3d 705 [2004]), the defendant conceded that the police had a right to frisk her, preserving only the contention that they had no right to remove an item from her pocket. All these cases are clearly distinguishable from the facts of this case. People v Batista (88 NY2d 650 [1996], supra), cited by the dissent, likewise does not support the dissent’s position. That case is distinguishable by the officer’s belief, based on personal experience, that the defendant was wearing a bulletproof vest (which, while not illegal, permitted the inference that the wearer was also armed). The officer testified that the outline of the vest was visible, that he wore one every day and that he was therefore familiar with “ ‘what a vest looks like when it’s sitting up on somebody’s chest’ ” (id. at 652).
Here there was no reasonable suspicion of criminal activity on the part of appellant, and the situation did not present the officer with “good cause for such fear,” especially in light of his testimony that the inquiry was a friendly conversation and that appellant was not a suspect in a crime or gang activity. In the absence of either of the requisite elements for conducting a stop and frisk, the weapon recovered from appellant’s person must be suppressed.
Accordingly, the order of disposition of the Family Court, Bronx County (Nancy M. Bannon, J.), entered on or about April 1, 2010, which adjudicated appellant a juvenile delinquent upon his admission that he committed acts that, if committed by an adult, would constitute the crime of criminal possession of a weapon in the second degree, and placed him on probation for a period of 18 months, should be reversed, on the law, without costs, and the delinquency petition dismissed.